# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3065

_____

Valerie J. Hawkins, Individually; Janice A. Patterson, Individually

*Plaintiffs - Appellants*

v.

Community Bank of Raymore

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 17, 2014
Filed: August 5, 2014

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Valerie Hawkins ("Hawkins") and Janice Patterson ("Patterson") appeal the district court's[1] grant of summary judgment in favor of Community Bank of Raymore ("Community") on their claim under the Equal Credit Opportunity Act ("ECOA"), 15

_____

[1] The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

U.S.C. § 1691 *et seq.*, and the district court's order striking their demand for a jury trial. For the reasons described below, we affirm.

## I. Background

Hawkins is married to Gary Hawkins, and Patterson is married to Chris Patterson. PHC Development, LLC ("PHC"), is a Missouri limited liability company with two members: Gary Hawkins and Chris Patterson, the latter in his capacity as trustee of the Chris L. Patterson and Janice A. Patterson Trust. Neither Hawkins nor Patterson have any legal interest in PHC. Between 2005 and 2008, Community made four loans—totaling more than $2,000,000—to PHC to fund the development of a residential subdivision. Each loan was modified several times. In connection with each loan and each modification, Hawkins, Patterson, and their husbands executed personal guaranties in favor of Community to secure the loans. Patterson also executed a deed of trust in connection with one of the modifications. In April 2012, PHC failed to make payments due under the loan agreements. Community declared the loans to be in default, accelerated the loans, and demanded payment both from PHC and from Hawkins and Patterson as guarantors.

Soon thereafter, Hawkins and Patterson filed this action against Community, seeking damages and an order declaring that their guaranties were void and unenforceable. They alleged that Community had required them to execute the guaranties securing PHC's loans solely because they are married to their respective husbands. They claimed that this requirement constituted discrimination against them on the basis of their marital status, in violation of the ECOA. Community, in turn, filed several state-law counterclaims, including claims for breach of the guaranties. As an affirmative defense to the breach-of-guaranty claims, Hawkins and Patterson argued that the guaranties were unenforceable as violative of the ECOA.

Community moved for summary judgment on Hawkins and Patterson's ECOA claim and on its breach-of-guaranty counterclaims. The district court concluded that Hawkins and Patterson were not "applicants" within the meaning of the ECOA and thus that Community had not violated the ECOA by requiring them to execute the guaranties. Accordingly, the district court granted summary judgment in favor of Community on Hawkins and Patterson's ECOA claim and on their ECOA-based affirmative defense to Community's breach-of-guaranty counterclaims. The district court then dismissed Community's state-law counterclaims without prejudice, declining to exercise continuing supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Hawkins and Patterson timely appealed the grant of summary judgment in favor of Community and the district court's order striking their demand for a jury trial.

## II. Discussion

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving parties and giving them the benefit of all reasonable inferences. *Barnhardt v. Open Harvest Co-op.*, 742 F.3d 365, 369 (8th Cir. 2014). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status." 15 U.S.C. § 1691(a). The statute defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). Interpreting this statutory definition, the Federal Reserve Bank promulgated 12 C.F.R. § 202.2(e),

which provides that "the term [applicant] includes guarantors."[2]   Relying on § 202.2(e), Hawkins and Patterson argue that they qualify as applicants within the meaning of the ECOA because they guaranteed PHC's debt to Community.  They do not argue that they qualify as applicants on any other basis.

This case turns, then, on whether we should apply § 202.2(e)'s definition of applicant, which would permit Hawkins and Patterson to pursue an ECOA claim as applicants solely because they executed guarantees to secure PHC's loans.  If they do not qualify as applicants, then Community did not violate the ECOA by requiring them to execute the guaranties.  *See* 15 U.S.C. § 1691(a) (proscribing only discrimination against applicants).  To determine whether we should defer to the Federal Reserve's interpretation of the ECOA's definition of applicant, we apply the two-step framework established by *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  Under the *Chevron* framework, "we ask first whether the intent of Congress is clear as to the precise question at issue.  If, by employing traditional tools of statutory construction, we determine that Congress' intent is clear, that is the end of the matter." *North Dakota v. E.P.A.*, 730 F.3d 750, 763 (8th Cir. 2013) (alteration omitted) (quoting *Baptist Health v. Thompson*, 458 F.3d 768, 773 (8th Cir. 2006)).  Only if we conclude that "the statute is silent or ambiguous with respect to the specific issue" presented will we then proceed to the second step of the *Chevron* framework, which requires us to consider whether "the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design." *Id.* (quoting *Baptist Health*, 458 F.3d at 773).

Applying the first step of the *Chevron* framework, we conclude that the text of the ECOA clearly provides that a person does not qualify as an applicant under the

---

[2]Congress has since amended the ECOA to vest authority to promulgate regulations under the statute in the Consumer Financial Protection Bureau, rather than in the Federal Reserve Board.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1085(1), 124 Stat. 1376, 2083 (2010).

statute solely by virtue of executing a guaranty to secure the debt of another. To qualify as an applicant under the ECOA, a person must "appl[y] to a creditor directly for . . . credit, or . . . indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). To "apply" means "to make an appeal or request esp[ecially] formally and often in writing and usu[ally] for something of benefit to oneself." Webster's Third New International Dictionary 105 (2002). Thus, the plain language of the ECOA unmistakably provides that a person is an applicant only if she requests credit. But a person does not, by executing a guaranty, request credit. "A 'guaranty' . . . [is] a promise to answer for another person's debt, default, or failure to perform. More specifically, a guaranty is an undertaking by a guarantor to answer for payment of some debt, or performance of some contract, of another person in the event of default." 38 Am. Jur. 2d Guaranty § 1 (2014). A guaranty is collateral and secondary to the underlying loan transaction between the lender and the borrower. While a guarantor no doubt desires for a lender to extend credit to a borrower, it does not follow from the execution of a guaranty that a guarantor has requested credit or otherwise been involved in applying for credit. Thus, a guarantor does not request credit and therefore cannot qualify as an applicant under the unambiguous text of the ECOA.[3]

The Sixth Circuit recently reached the contrary conclusion, finding it to be ambiguous whether a guarantor qualifies as an applicant under the ECOA. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp.*, 754 F.3d 380, 2014 WL 2609616 (6th Cir. 2014).[4] The court acknowledged that "[a] guarantor does not

---

[3]As noted above, a request for credit can be made directly, or it can be made indirectly by seeking to increase the credit limit on an existing credit plan. 15 U.S.C. § 1691a(b). As we have explained, we certainly do not view executing a guaranty as a *direct* request for credit. And Hawkins and Patterson have not argued that this case involves the sort of "indirect" request recognized under the ECOA.

[4]Hawkins and Patterson also argue that several other circuits have applied § 202.2(e)'s definition of applicant to include guarantors. *See, e.g., Silverman v.*

traditionally approach a creditor herself for credit. Rather, . . . a guarantor is a third party to the larger application process." *Id.* at \*4. With this much we agree, and for us, this ends the inquiry because it demonstrates that a guarantor unambiguously does not request credit. "Where Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent." *Bifulco v. United States*, 447 U.S. 381, 387 (1980). Nevertheless, the court went on to assert that "a guarantor does formally approach a creditor in the sense that the guarantor offers up her own personal liability to the creditor if the borrower defaults." *RL BB Acquisition*, 2014 WL 2609616, at \*4. We find it to be unambiguous that assuming a secondary, contingent liability does not amount to a request for credit. A guarantor engages in different conduct, receives different benefits, and exposes herself to different legal consequences than does a credit applicant. "[T]here is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor." *Moran Foods, Inc. v. Mid-Atlantic Market Dev. Co.*, 476 F.3d 436, 441 (7th Cir. 2007) (discussing whether the Federal Reserve's interpretation of applicant to include guarantors warrants *Chevron* deference).[5]

---

*Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28 (3d Cir. 1995); *Mayes v. Chrysler Credit Corp.*, 37 F.3d 9 (1st Cir. 1994). However, these cases applied the regulatory definition without considering whether that definition warranted *Chevron* deference. As such, we do not find those cases to be instructive here.

[5]In *RL BB Acquisition,* the court also observed that the ECOA's separate use of the terms "applicant" and "debtor" in other portions of the statute "suggests that the applicant and the debtor are not always the same person." 2014 WL 2609616, at \*4. From this, the court inferred that "it would be reasonable to conclude that the applicant could be a third party, such as a guarantor." *Id.* We are not persuaded that the ECOA's distinction between applicants and debtors compels the conclusion that a person can qualify as an applicant without *applying* for credit, that is, without requesting credit. The ECOA's definition of applicant unambiguously does not include guarantors, and we are not inclined to inject ambiguity into the statute's plain text. *See Bifulco*, 447 U.S. at 387.

Because the text of the ECOA is unambiguous regarding whether a guarantor constitutes an applicant, we will not defer to the Federal Reserve's interpretation of applicant, and we conclude that a guarantor is not protected from marital-status discrimination by the ECOA. Our conclusion also comports with the purposes and policies underlying the ECOA. "The statute was initially designed, at least in part, to curtail the practice of creditors who refused to grant a wife's credit application without a guaranty from her husband." *Mayes v. Chrysler Credit Corp.*, 37 F.3d 9, 11 (1st Cir. 1994); *see also Moran Foods*, 476 F.3d at 441 ("[W]hat the Act was intended to do was forbid a creditor to deny credit to a woman on the basis of a belief that she would not be a good credit risk because she would be distracted by child care or some other stereotypically female responsibility."); *Anderson v. United Fin. Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982). These policies focus on ensuring fair access to credit by preventing lenders from excluding borrowers from the credit market based on the borrowers' marital status. But the considerations are different in the case of a guarantor. By requesting the execution of a guaranty, a lender does not thereby exclude the guarantor from the lending process or deny the guarantor access to credit. Here, Hawkins and Patterson do not claim that they were excluded from the lending process due to their marital status. Indeed, they complain that they were improperly *included* in that process by being required to execute guaranties. Thus, we believe that the purposes and policies of the ECOA buttress our interpretation of the statute's plain meaning.[6]

_____

[6]We also note that under Missouri law, which governs the loans and guaranties in this case, "co-ownership of property by a husband and wife creates a presumption of tenancy by the entirety." *Lederle v. Lederle*, 916 S.W.2d 423, 429 (Mo. Ct. App. 1996). "An execution arising from a judgment against one spouse alone cannot affect property held by a husband and wife as tenants by the entireties." *Wehrheim v. Brent*, 894 S.W.2d 227, 229 (Mo. Ct. App. 1995). Thus, it likely was necessary for Hawkins and Patterson to execute their guaranties in order to induce Community to loan $2,000,000 to PHC because Community would then be able to execute on any marital assets in the event of a default. Community's request that Hawkins and Patterson execute guaranties would then have been "sound commercial practice unrelated to

As noted above, Hawkins and Patterson do not argue that they qualify as applicants for any reason other than their status as guarantors. They have not alleged that they participated in the loan-application process, and they have disclaimed having any interest in PHC. Accordingly, we conclude that Hawkins and Patterson are not applicants under the ECOA, and thus Community did not violate the ECOA by requiring them to execute the guaranties. As such, the district court did not err in granting summary judgment in favor of Community on Hawkins and Patterson's ECOA claim or their ECOA-based affirmative defense.

Finally, because the district court properly granted summary judgment in favor of Community on Hawkins and Patterson's ECOA claim and dismissed Community's counterclaims, this case will not proceed to trial. As such, Hawkins and Patterson's argument that the district court erred in striking their demand for a jury trial is moot.

## III. Conclusion

For the foregoing reasons, we affirm.

COLLOTON, Circuit Judge, concurring.

I agree with the court that a guarantor is not an "applicant" within the meaning of 15 U.S.C. § 1691(a). The Federal Reserve Board thus exceeded its authority when it purported to redefine "applicant" in 12 C.F.R. § 202.2(e) to include "guarantors" for purposes of rules relating to when a creditor may require the signature of a spouse or other person on a credit instrument. I add these further reasons for joining the judgment of the court.

---

any stereotypical view of a wife's role." *Moran*, 476 F.3d at 442.

The Equal Credit Opportunity Act defines "applicant," in relevant part, as "any person who applies to a creditor . . . for . . . credit."  15 U.S.C. § 1691a(b).  The ordinary meaning of "to apply," as understood at the time of the statute's enactment in 1974 and significant amendment in 1976, is "to make an appeal or a request . . . *usu[ally] for something of benefit to oneself . . . ⟨ ~ to a bank for a loan⟩.*"  *Webster's Third New International Dictionary* 105 (1971) (emphasis added).  Under that usual meaning, an "applicant" who "applies for credit" is one who requests credit to benefit herself, not credit to benefit a third party.  That there are unusual meanings of "apply" that encompass making a request on behalf of another is not sufficient to make a term ambiguous for purposes of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Analysis under the first step of *Chevron* to determine whether the statutory text is unambiguous begins with ordinary meaning.  *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009).

The context of the ECOA confirms that Congress employed the ordinary meaning of "apply" in the phrase "applies for credit."  The statute contemplates a first-party applicant who requests credit to benefit herself.  Section 1691(d)(1) directs that within thirty days "after receipt of a completed application for credit, a creditor shall notify *the applicant* of its action on the application." (emphasis added).  The statute's use of the definite article shows that the applicant is the single person to whom credit would be extended, not a third party asking on behalf of the putative debtor.  *See also* S. Rep. No. 94-589, at 7-10 (1976).  Similarly, the statute as amended in 1991 refers to a creditor taking action in connection with "the applicant's application for a loan," 15 U.S.C. § 1691(e)(1), and it would be unnatural to conclude that a third party who offers a promise in support of an application thereby submits what the statute describes as an "application for a loan," *id*., and a "completed application for credit," *id*. § 1691(d)(1).

The statute defines "adverse action" on a credit application, but excludes from that phrase "a refusal to extend additional credit *under an existing credit arrangement*

*where the applicant is delinquent or otherwise in default*." 15 U.S.C. § 1691(d)(6) (emphasis added). This provision confirms that "the applicant" is the person to whom credit is extended and who is responsible for making payments on an existing loan. A guarantor or other third-party requestor does not in ordinary usage become "delinquent" or "in default" on a loan or other existing credit arrangement. But if a guarantor could be an "applicant," then the creditor's refusal to extend additional credit to a delinquent borrower would be an "adverse action" on the *guarantor's* "application," thus entitling the third-party guarantor to a statement of reasons that the creditor need not furnish to the first-party applicant. *Id*. § 1691(d)(2). This is not a natural reading of the text.

The statute specifically envisions the involvement of a third party who requests an extension of credit to a first-party applicant, but distinguishes between the third-party requestor and the "applicant": "Where a creditor has been *requested by a third party* to make a specific extension of credit directly or indirectly *to an applicant*, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly *through the third party*, provided in either case that the identity of the creditor is disclosed." *Id.* § 1691(d)(4) (emphases added). Again, the statutory text confirms that the "applicant" is the party to whom credit will be extended. When ordinary meaning aligns with the natural reading of a term in the context of a statute, there is no ambiguity that gives an agency license to adopt an alternative definition. *Carcieri*, 555 U.S. at 388-90.

The regulators seemed to recognize the plain meaning of "applicant" in the first decade after the ECOA was enacted. The Board solicited comment in 1976 about the meaning of "applicant," Equal Credit Opportunity, 41 Fed. Reg. 29,870, 29,871 (proposed July 20, 1976), but "to resolve confusion about the scope of this term," the Board specifically provided that "a guarantor, surety, endorser, or similar party" is *not* an applicant. Equal Credit Opportunity, 41 Fed. Reg. 49,123, 49,124, 49,132 (proposed Nov. 8, 1976). As the Board acknowledged, the unadorned statutory

definition of "applicant" was sufficient to forbid a creditor to require the signature of a guarantor on a discriminatory basis. *Id*. at 49,124. If a creditworthy married person applies for credit, and the creditor demands based solely on marital status that her or his spouse sign a guaranty as a condition of extending credit, then the creditor has violated the statute and regulations, and the married applicant has a cause of action against the creditor as an "aggrieved applicant." 15 U.S.C. § 1691e(a).

The Board's effort to "redefine 'applicant' . . . to include guarantors" apparently was motivated by dissatisfaction with Congress's decision to limit the cause of action under the ECOA to an "aggrieved *applicant*." *See* Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary, 50 Fed. Reg. 10,890, 10,891, 10,896 (proposed Mar. 18, 1985). The regulators observed that if a creditor illegally required a spouse to sign a guaranty as a condition of extending credit to an applicant, then only the applicant—not the guarantor—had "standing to sue" as an "aggrieved applicant." *Id.* at 10,891; *see also* Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary, 50 Fed. Reg. 48,018, 48,020 (Nov. 20, 1985). The redefinition of "applicant" in 12 C.F.R. § 202.2(e) to include "guarantors" was designed to give guarantors independent standing to sue. The Board believed that allowing guarantors to bring suit would have the effect of "enhancing protections," although the Board also thought "guarantors, if they have standing to sue, would merely join in the lawsuit" brought by "applicants" in the normal case. 50 Fed. Reg. at 48,025.

Whatever might be the salutary effects of the change in policy, it was not a choice for the Board to make. Congress opted to limit the cause of action to an "aggrieved applicant," and the statute gave "applicant" its ordinary meaning of one who applies for credit to benefit oneself. Any decision to expand the civil liability of creditors and to provide a cause of action for guarantors must come from Congress.

———————————————

-11-